# UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

| | |
|---|---|
| JOHN GIORDANO and JEANETTE GIORDANO, et al., | |
| Plaintiffs, | 1:19-cv-21573-NLH-KMW |
| v. | **OPINION** |
| SOLVAY SPECIALTY POLYMERS USA, LLC, et al., | |
| Defendants. | |

<u>**APPEARANCES**</u>:

DAVID M. CEDAR
SHAUNA LAUREN FRIEDMAN
ALAN HERSCHEL SKLARSKY
WILLIAMS CEDAR, LLC
8 KINGS HIGHWAY WEST
SUITE B
HADDONFIELD, NJ 08033

     *On behalf of Plaintiffs*

KEGAN ANDREW BROWN
LATHAM & WATKINS LLP
885 3RD AVENUE
NEW YORK, NY 10022

     *On behalf of Defendant Solvay Specialty Polymers USA, LLC,*
     *successor by merger to Solvay Solexis, Inc.*

JOHN D. NORTH
IRENE HSIEH
JEMI GOULIAN LUCEY
MARJAN MOUSSAVIAN
GREENBAUM, ROWE, SMITH & DAVIS, LLP
99 WOOD AVENUE SOUTH
ISELIN, NJ 08830

KHRISTOPH ANDREAS BECKER
STEPTOE & JOHNSON LLP
1114 AVENUE OF THE AMERICAS
35TH FLOOR
NEW YORK, NY 10036

ROBERT L. SHUFTAN (*pro hac vice*)
STEPTOE & JOHNSON LLP
227 WEST MONROE STREET
SUITE 4700
CHICAGO, IL 60606

JOO CHA WEBB (*pro hac vice*)
STEPTOE & JOHNSON LLP
633 WEST FIFTH STREET
SUITE 1900
LOS ANGELES, CA 90071

     *On behalf of Defendant Arkema, Inc.*

LANNY S. KURZWEIL
NATALIE S. WATSON
RYAN A. RICHMAN
MCCARTER & ENGLISH, LLP
FOUR GATEWAY CENTER
100 MULBERRY STREET
PO BOX 652
NEWARK, NJ 07101-0652

     *On behalf of Defendants E. I. du Pont de Nemours & Company,*
     *The Chemours Company and The Chemours Company FC, LLC*

DONALD J. CAMERSON, II
JAMES W. CROWDER, IV
BRESSLER, AMERY & ROSS, P.C.
325 COLUMBIA TURNPIKE
FLORHAM PARK, NJ 07932

ANDREW J. CALICA (*pro hac vice*)
JORDAN SAGALOWSKY (*pro hac vice*)
MAYER BROWN LLP
1221 AVENUE OF THE AMERICAS
NEW YORK, NY 10020

     *On behalf of Defendant 3M Company*

**<u>HILLMAN</u>, District Judge**

    This matter concerns claims by Plaintiffs[1] regarding the

---

[1] Plaintiffs all reside in Swedesboro, Logan Township, and

contamination of their private water wells with poly- and perfluoroalkyl substances ("PFAS").  Presently before the Court are the motions of Defendants, which either discharged or manufactured the PFAS, to dismiss Plaintiffs' claims.  For the reasons expressed below, Defendants' motions will be granted on one issue, but denied in all other respects.

<u>**BACKGROUND**</u>

Plaintiffs' complaint[2] describes the nature of their case and provides the following background to support their claims:

This is a civil action for compensatory and punitive damages, including medical monitoring and costs incurred and to be incurred by Plaintiffs arising from the intentional, knowing, reckless, and negligent acts and omissions of Defendants, which resulted in the contamination of Plaintiffs' private water supply.  The contamination was caused by the Defendants'

---

Pedricktown, New Jersey.  They are John Giordano, Jeanette Giordano, James Giordano, Jessica Giordano, Keith Dalton, Ann Aerts, Armando Fernandez, Edward Franklin, Dana Franklin, Austin Franklin, Michael Harper, Susan Koye, Jennifer Harper, Savannah Harper, Elizabeth Harper, Helen Karol, Wesley Kille, Leslie Kille, Gage Kille, Lucia Kille, Malayna Reistle, Michael Lange, Andrew Solari, Jim Rapisardi, Justin Schaller, Julie Schaller, Rebecca Schaller, and Justin Schaller Jr.

[2] The operative complaint (Docket No. 46) is the third version since Defendants' removed Plaintiffs' complaint from state court.  Plaintiffs amended their complaint several times to remove parties, to correctly identify the names of defendants, and to update various water test results, among other things. The Court will refer to Plaintiffs' most recent pleading simply as their "complaint."

intentional manufacturing, use, discharge, and/or disposal of poly- and perfluoroalkyl substances ("PFAS"), including perfluorononanoic acid ("PFNA"), perfluorooctanoic acid ("PFOA"), and perfluorooctanesulfonic acid ("PFOS"), and their replacement compounds, including but not limited to "GenX."

PFAS are man-made chemicals manufactured and used in the United States since the 1940s.  PFAS have fire-resistant properties and act as oil, grease, and water repellants; have been used to make numerous household products like Stainmaster®, Scotchgard®, Teflon®, Gore-Tex® and Tyvek®; and have long been used in aqueous film-forming foam used to fight fires.  PFAS compounds are extremely resistant to degradation and thus persist indefinitely in the environment.

PFAS compounds bioaccumulate resulting in the buildup of these toxins in living tissue, and people who consume these substances through drinking water and other means accumulate increasing concentrations of PFAS in their blood.  Some PFAS are classified as carcinogenic, and Plaintiffs' complaint relates that studies show that exposure to PFAS may cause testicular cancer, kidney cancer, liver cancer, autoimmune disorders, endocrine disorders, developmental defects to fetuses during pregnancy, developmental defects to breastfed babies, reduced vaccine response, increased cholesterol, and increased liver enzymes.

Replacement chemicals including but not limited to "GenX" have been substituted by Defendants in place of their PFAS chemicals.  These replacement chemicals are being touted as short-chain and having shorter half-lives.  However, these replacement chemicals may have similar toxicity, and these replacement chemicals do not break down in the environment and have also been detected in drinking water, groundwater, and surface waters.

The New Jersey Department of Environmental Protection has issued groundwater quality criteria for PFAS, and NJDEP issued a Statewide PFAS Directive, Information Request and Notice to Insurers against Defendants "to notify them that the Department believes them to be responsible for the significant contamination of New Jersey's natural resources, including the air and waters of the State, with poly- and perfluoroalkyl substances" which encompass the air and water utilized by Plaintiffs.

Defendants are Solvay Specialty Polymers, USA, LLC, Solvay Solexis, Inc. ("Solvay"); Arkema, Inc. ("Arkema"); E.I. du Pont de Nemours & Company, The Chemours Company, The Chemours Company FC, LLC, ("EID/CC"); and The 3M Company ("3M").

Solvay has been the owner and operator of a manufacturing facility located at 10 Leonard Lane, West Deptford, NJ 08085 from 1990 to present.  Arkema owned and operated the West

Deptford facility prior to 1990, and Arkema manufactured polyvinylidene fluoride ("PVDF") and other high-performance materials at the West Deptford facility prior to 1990. From approximately 1990 to 2012, Solvay manufactured PVDF at this facility, which is a specialty plastic utilized in conjunction with lithium batteries, medical and defense uses, semi-conductors, or other instances when a higher level of purity is required. Solvay also used sodium perfluorooctanoate (NaPFO) as a surfactant at the West Deptford Facility, which was supplied to them by 3M. NaPFO degrades into PFOA.

DuPont owned and operated Chambers Works, 67 Canal Road and Route 130, located in Pennsville and Carneys Point Townships, New Jersey from 1891 to 2015. DuPont produced, utilized, and discharged into the environment approximately 1,200 chemicals, pollutants, and other hazardous substances from the Chambers Works facility. PFOA was used at Chambers Works beginning in the late 1950s to, among other things, manufacture fluoroelastomers, perfluoroelastomers and specialty fluoroelastomers used in a variety of consumer and other products for their chemical non-stick and heat-resistant properties. Telomers were also used and manufactured at Chambers Works, and PFOA is a by-product of the telomer manufacturing process. In 2015, DuPont transferred its Chambers Works facility to Chemours, but continued to operate at the location pursuant to an industrial lease (whereby DuPont was

6

the tenant and Chemours FC was the landlord).  3M supplied DuPont
with PFOA.

Plaintiffs claim that Defendants knew or should have known
of the health and environmental impacts of PFAS for decades
but continued to use them in products and release them into the
environment.  NJDEP sampled 992 private wells as of June 2018
for PFAS, and out of those 400 sampled wells, 83 wells (21%)
required the installation of a point of entry treatment ("POET")
system for PFNA or PFOA.  All Plaintiffs in this action are part
of the 21% of private wells requiring installation of a POET
system due to detection of high concentrations of PFAS in their
private water wells.

Plaintiffs claim that as a result of the high
concentrations of PFAS in their water supply due to Defendants'
negligent, careless, wrongful, reckless, and intentional failure
to take appropriate steps to prevent and reduce the discharge of
PFAS into Plaintiffs' drinking water, they are likely
to have accumulated high levels of PFAS in their blood as a
result of their long periods of exposure to high concentration
of PFAS, and they are at risk for serious physical injuries and
diseases related to their consumption, ingestion, and exposure
to elevated levels of PFAS.  Plaintiffs' increased risk of
serious physical injuries and diseases makes it reasonably
necessary for Plaintiffs to undergo periodic diagnostic medical

examinations, including blood testing, different from what would be prescribed in the absence of such exposure, for which Plaintiffs claim Defendants should be liable.

Plaintiffs further claim that the contamination of Plaintiffs' private wells has also severely disrupted their lives.  Their properties have significantly diminished in value, and they have and will continue to incur substantial costs for bottled water and maintenance of the POET system to treat their contaminated private wells in order to reduce their exposure to the contaminants in their water supply.  Plaintiffs claim they have and will be subjected to annoyance, inconvenience, and distress in having to make repeated trips to pick up bottled water and use bottled water instead of tap water for such ordinary tasks as cooking, brewing coffee and tea, brushing their teeth, watering their vegetable gardens, and feeding pets.

Plaintiffs have asserted nine counts against Defendants: Count I - Negligence against all Defendants, Count II - Gross Negligence against all Defendants, Count III - Private Nuisance against Solvay, Arkema, DuPont and Chemours, Count IV - Past and Continuing Nuisance against Solvay, Arkema, DuPont and Chemours, Count V - New Jersey Spill Compensation and Control Act ("Spill Act"), N.J.S.A. 58:10-23.11 et seq., against all Defendants, Count VI - Strict Liability (Abnormally Dangerous Activities) against Solvay, Arkema, DuPont and Chemours, Count VII - Strict

8

Liability (Failure to Warn) against 3M, Count VIII - Strict
Liability (Defective Design) against 3M, and Count IX - Punitive
Damages against all Defendants.

All Defendants have moved to dismiss Plaintiffs' complaint,
arguing various pleading deficiencies.  Plaintiffs have opposed
Defendants' motions.

## DISCUSSION

### A.    Subject matter jurisdiction

The averred basis for this Court's subject matter
jurisdiction is 28 U.S.C. § 1332(a).  On February 16, 2021, this
Court directed the parties to file a Joint Certification of the
Citizenship of the Parties within 10 days.  The parties filed
the Joint Certification on February 26, 2021 (Docket No. 117)
and the Court is satisfied that there is complete diversity of
citizenship between Plaintiffs and Defendants.

### B.    Standard for Motion to Dismiss

When considering a motion to dismiss a complaint for
failure to state a claim upon which relief can be granted
pursuant to Federal Rule of Civil Procedure 12(b)(6), a court
must accept all well-pleaded allegations in the complaint as
true and view them in the light most favorable to the plaintiff.
Evancho v. Fisher, 423 F.3d 347, 351 (3d Cir. 2005).  It is well
settled that a pleading is sufficient if it contains "a short
and plain statement of the claim showing that the pleader is

9

entitled to relief." Fed. R. Civ. P. 8(a)(2).

"While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do . . . ." Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007) (alteration in original) (citations omitted) (first citing Conley v. Gibson, 355 U.S. 41, 47 (1957); Sanjuan v. Am. Bd. of Psychiatry & Neurology, Inc., 40 F.3d 247, 251 (7th Cir. 1994); and then citing Papasan v. Allain, 478 U.S. 265, 286 (1986)).

To determine the sufficiency of a complaint, a court must take three steps: (1) the court must take note of the elements a plaintiff must plead to state a claim; (2) the court should identify allegations that, because they are no more than conclusions, are not entitled to the assumption of truth; and (3) when there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement for relief. Malleus v. George, 641 F.3d 560, 563 (3d Cir. 2011) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 664, 675, 679 (2009) (alterations, quotations, and other citations omitted).

A district court, in weighing a motion to dismiss, asks

"not whether a plaintiff will ultimately prevail but whether the claimant is entitled to offer evidence to support the claim." Twombly, 550 U.S. at 563 n.8 (quoting Scheuer v. Rhoades, 416 U.S. 232, 236 (1974)); see also Iqbal, 556 U.S. at 684 ("Our decision in Twombly expounded the pleading standard for 'all civil actions' . . . ."); Fowler v. UPMC Shadyside, 578 F.3d 203, 210 (3d Cir. 2009) ("Iqbal . . . provides the final nail in the coffin for the 'no set of facts' standard that applied to federal complaints before Twombly."). "A motion to dismiss should be granted if the plaintiff is unable to plead 'enough facts to state a claim to relief that is plausible on its face.'" Malleus, 641 F.3d at 563 (quoting Twombly, 550 U.S. at 570).

A court in reviewing a Rule 12(b)(6) motion must only consider the facts alleged in the pleadings, the documents attached thereto as exhibits, and matters of judicial notice. S. Cross Overseas Agencies, Inc. v. Kwong Shipping Grp. Ltd., 181 F.3d 410, 426 (3d Cir. 1999). A court may consider, however, "an undisputedly authentic document that a defendant attaches as an exhibit to a motion to dismiss if the plaintiff's claims are based on the document." Pension Benefit Guar. Corp. v. White Consol. Indus., Inc., 998 F.2d 1192, 1196 (3d Cir. 1993). If any other matters outside the pleadings are presented to the court, and the court does not exclude those matters, a

11

Rule 12(b)(6) motion will be treated as a summary judgment motion pursuant to Rule 56.  Fed. R. Civ. P. 12(b).

    **C.   Analysis**

    For the most part, Defendants assert the same arguments for the dismissal of Plaintiffs' claims:[3]  (1) PFAS is an umbrella term comprising thousands of different per- and polyfluoroalkyl substances, and Plaintiffs do not connect the specific PFAS to a specific defendant, instead holding every defendant responsible for all PFAS contamination, (2) Plaintiffs fail to allege how PFAS traveled miles away from where they were discharged and contaminated their water supply, (3) Plaintiffs fail to assert any bodily injury claims because consumption of PFAS-containing drinking water alone - without manifestation of any actual physical injuries - is insufficient to establish bodily injury, and even if they could, many of the Plaintiffs' claims are time-barred, (4) Plaintiffs are not entitled to their requested relief of medical monitoring, (5) Plaintiffs cannot state a New Jersey Spill Act claim because Plaintiffs have failed to plead that they have incurred costs to clean up and remove the

---

[3] Plaintiffs' complaint relates that 3M has been identified by the United States Environmental Protection Agency as the dominant global producer of PFOA and related chemicals manufacturing at least 85% of total worldwide volumes.  3M's arguments in support of its motion to dismiss differ in some respects because 3M sold PFAS to the other defendants rather than discharged PFAS itself.  The Court will address those arguments separately.

contaminates, and (6) Plaintiffs cannot assert a stand-alone claim for punitive damages, and in any event Defendants' alleged conduct does not warrant punitive damages.

The Court finds that Plaintiffs' complaint readily satisfies the Rule 8(a) and Twombly/Iqbal pleading standards to proceed in all respects against all defendants, with only some minor modifications as explained below.

### 1.   The complaint satisfies Rule 8(a)

First, from a Rule 8(a)(2) notice pleading standpoint, Plaintiffs have provided the requisite "short and plain statement of the claim showing that the pleader is entitled to relief."  Plaintiffs' complaint details the nature and history of PFAS and each Defendant's connection to PFAS.  Plaintiffs contend that despite being aware of the toxicity of PFAS, Defendants continued to manufacture or release them into the environment.  Plaintiffs allege that the PFAS released from Defendants' facilities is present in their water supply which required the installation of a water treatment systems. Plaintiffs allege that they have ingested PFAS, and due to the bioaccumulation properties of PFAS Plaintiffs have likely accumulated high levels of PFAS in their blood, which may cause them significant adverse health consequences.  Plaintiffs also allege a loss in property value and the expense and hassle of having to use bottled water for drinking and everyday

13

activities, such as brushing their teeth.   In satisfaction of Rule 8(a)(3), Plaintiffs demand various forms of relief, such as monetary compensation and medical monitoring.

### 2.   The complaint satisfies <u>Twombly/Iqbal</u>

Second, the Court finds that Plaintiffs' complaint meets the somewhat more exacting <u>Twombly/Iqbal</u> pleading standards, and finds Defendants' bases for dismissal to be unavailing.

#### (1) *Plaintiffs connect the specific PFAS to a specific defendant*

The Court rejects Defendants' first argument that Plaintiffs generally allege PFAS have contaminated their water supply without attributing which Defendant discharged which specific PFAS.  The complaint details the specific PFAS contaminating Plaintiffs' private water wells as PFNA, PFOA or PFOA and PFOS combined.  Plaintiffs allege that Solvay/Arkema discharged PVDF, which is composed of approximately 74% PFNA, and PFOA, supplied to it by 3M.  Plaintiffs allege that EID/CC discharged PFOA, which it obtained from 3M, and other PFAS, including PFNA.  The complaint directly ties Defendants' release of specific PFAS to the PFAS found in their water.[4]

---

[4] In its reply, Arkema argues that it is not a part of the NJDEP's Directive, and Plaintiffs provide no other facts to support their claims that Arkema's operation of the West Deptford plant prior to 1990 caused the purported types of PFAS contamination in Plaintiffs' wells.  Arkema also points out that it is not a "predecessor in interest" to Solvay, the current owner of the West Deptford plant, and therefore it cannot have

> **(2)** ***Plaintiffs' claim that Defendants' release of PFAS contaminated their water supply is plausible***

As for Defendants' argument that Plaintiffs' complaint is deficient because it fails to explain how PFAS discharged miles away ended up in their water supply, that amounts to a defense to liability, not a pleading deficiency.  Plaintiffs' complaint asserts that PFAS are in their water, and Defendants discharged those PFAS into the environment.[5]  PFAS were discovered in Plaintiffs' wells when the NJDEP sampled private wells in various locations, including Plaintiffs' properties in Salem and Gloucester counties, all of which are located between the Solvay/Arkema and EID/CC facilities.  Plaintiffs' claim that Defendants' release of PFAS resulted in their water contamination is therefore plausible.

> **(3)** ***Plaintiffs do not assert bodily injury claims at this time***

---

liability on that theory.  Plaintiffs do not rely only upon the NJDEP directive to support their claims, and Plaintiffs have asserted claims directly against Arkema for its manufacture of PVDF and other high-performance materials at the West Deptford facility prior to 1990.  Plaintiffs specifically allege that prior to 1990, as a result of their operations, Arkema released massive amounts of PFOA into the surrounding air and water contaminating the site, off-site properties including Plaintiffs', and New Jersey's natural resources with the PFOA chemical.  (Docket No. 46 at 11.)  Whether the contamination of Plaintiffs' water is proven to be attributable to Arkema's action prior to 1990 cannot be resolved on a motion to dismiss.

[5] The complaint also asserts that these Defendants' facilities released PFAS into the air as well as surface waters.

Next, with regard to Plaintiffs' allegations as to how PFAS can cause significant bodily injuries, Plaintiffs agree with Defendants that they are not asserting claims for bodily injury at this time.  Plaintiffs assert that it is likely they have suffered personal injury, and hence the request for medical monitoring, but Plaintiffs do not claim bodily injury currently. The Court cannot dismiss a claim that Plaintiffs do not make.

### (4) *Plaintiffs' claim for medical monitoring is permissible*

On the issue of medical monitoring, Defendants contend that Plaintiffs have not alleged sufficient facts to justify that relief.  Essentially Defendants argue that because Plaintiffs do not have any evidence of physical injury at this time and plead none, they fail to provide any basis for medical monitoring.  It is axiomatic that before Plaintiffs can recover for their damages, they must first prove their claims.  At this stage in the case, Plaintiffs have alleged sufficient facts to support their claims against Defendants regarding their release of PFAS, which Plaintiffs plead are carcinogenic, into the environment and contaminating Plaintiffs' water supply.  These allegations support the plausibility of Plaintiffs' claims that Defendants' actions cause them to be at risk for serious physical injuries and diseases related to their consumption, ingestion, and exposure to elevated levels of PFAS.

In addition to money damages, another form of relief Plaintiffs request for the alleged harm done by Defendants' actions is to monitor their health to look out for serious health issues.  A demand for medical monitoring may be a request for a legal remedy or one for equitable relief, depending on a case-specific analysis.  Giovanni v. United States Department of Navy, 906 F.3d 94, 119-20 (3d Cir. 2018).  Whichever form of relief it may be classified as in this case,[6] dismissing Plaintiffs' medical monitoring claim would be premature.

> **(5)   *Plaintiffs' Spill Act claim may proceed, but with two caveats***

Defendants' argument that Plaintiffs' Spill Act claim fails because they do not plead that they have incurred costs to clean up and remove the contaminates, and Plaintiffs' contrary argument that they have, are both off-target.[7]

---

[6] See Ayers v. Township of Jackson, 525 A.2d 287, 314 (N.J. 1987) ("In our view, the use of a court-supervised fund to administer medical-surveillance payments in mass exposure cases ... is a highly appropriate exercise of the Court's equitable powers."), cited in, Giovanni, 906 F.3d at 120.

[7] In addition to the same arguments made by the other Defendants, 3M argues that as a manufacturer, rather than a discharger, of PFAS, it cannot be held liable under the Spill Act because Plaintiffs have not alleged the requisite connection between the manufacturing of a hazardous substance and the other Defendants' discharge of the hazardous substance.  The Spill Act "establishes a broad scope of liability," holding responsible "any person," which is defined to encompass a corporate entity, "who has discharged a hazardous substance, or is in any way responsible for any hazardous substance."  New Jersey Dept. of Environmental Protection v. Dimant, 51 A.3d 816, 821 (N.J. 2012)

N.J.S.A. 58:10-23.11g provides, in relevant part, that "any person who has discharged a hazardous substance, or is in any way responsible for any hazardous substance, shall be strictly liable, jointly and severally, without regard to fault, for all cleanup and removal costs no matter by whom incurred."[8]  N.J.S.A. 58:10-23.11b defines "cleanup and removal costs" as "all costs associated with a discharge, incurred by the State or its political subdivisions or their agents or any person with written approval from the department in the: (1) removal or attempted removal of hazardous substances, or (2) taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare, including but not limited to, public and private property, shorelines, beaches, surface waters, water columns and bottom sediments, soils and other affected property, including wildlife and other natural resources . . . ."

The Court notes two potential issues with Plaintiffs' Spill Act claim.  Plaintiffs contend that their substantial costs for bottled water as a result of the contaminated water supply

---

(quoting N.J.S.A. 58:10-23.11g(c)(1)).  Plaintiffs' complaint sufficiently pleads that 3M is an entity that is "in any way responsible" for their contaminated water supply.

[8] The Spill Act does not authorize "damages arising from emotional distress, enhanced risk of disease, loss of enjoyment of property, and other economic and financial harm."  Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C., 655 F. Supp. 2d 473, 504 (D.N.J. 2009) (quoting Bahrle v. Exxon Corp., 145 N.J. 144, 155, 678 A.2d 225 (1996)).

constitutes "cleanup costs" because purchasing and using bottled water is the "taking of reasonable measures to prevent or mitigate damage to the public health, safety, or welfare."  Even accepting that premise as true, several courts have found that "written approval from the department" is required to maintain such a claim, and Plaintiffs' complaint is silent on this issue. See Bonnieview Homeowners Ass'n v. Woodmont Builders, L.L.C., 655 F. Supp. 2d 473, 504 (D.N.J. 2009) (granting summary judgment to defendants on the plaintiffs' Spill Act claim for "clean up and removal costs," finding that in order for a private party to obtain reimbursement for such costs, he must obtain written approval from the NJDEP for these costs and the plaintiffs had not done so) (citing Interfaith Cmty. Org. v. Honeywell Int'l, Inc., 263 F. Supp. 2d 796, 867 (D.N.J. 2003) (concluding "that such costs were approved by and/or incurred at the direction of NJDEP and thus are recoverable under the Spill Act")); Player v. Motiva Enterprises LLC, 2006 WL 166452, at *15 (D.N.J. 2006) (finding that because the plaintiffs had not obtained NJDEP approval for any cost incurred in the form of investigative costs, defendant was entitled to summary judgment on the plaintiffs' Spill Act claim).

It is unclear, however, when in the course of litigation a party is required to receive written approval of cleanup costs from the NJDEP, and, accordingly, it is unclear that in order to

maintain a claim for cleanup costs an approval in writing from the NJDEP must be set forth in an initial pleading.  The caselaw appears to have addressed the written-approval requirement at the summary judgment stage.  Consequently, the Court will not dismiss Plaintiffs' Spill Act claim on this basis, but notes the issue for the benefit of the parties.

Another concern with Plaintiffs' Spill Act claim is that even if they did incur cleanup costs, and even if they sought approval for the reimbursement of those costs from the NJDEP, whether the Spill Act provides these individual homeowners with a private cause of action to recover cleanup costs is not clear. In Emerald Bay Developers, LLC v. Lenyk Automotive, Inc., 2018 WL 4568358, at *4 n.8 (N.J. Sup. Ct. App. Div. 2018), the New Jersey Appellate Division noted that in a recent published Appellate Division case, the court explained that the Spill Act only provides for two private causes of action: "one to recover clean-up costs from [other] discharge[r]s (contribution claim), N.J.S.A. 58:10-23.11f(a)(2), and one to recover damages from the NJDEP, or Spill Compensation Fund." (citing N.J. Dep't of Envtl. Prot. v. Exxon Mobil Corp., 453 N.J. Super. 272 (App. Div.), cert. denied, 233 N.J. 378 (2018) (quoting Bonnieview Homeowners Ass'n v. Woodmont Builders, LLC, 655 F. Supp. 2d 473, 503 (D.N.J. 2009)) (some alterations and quotations omitted).  The court in Emerald Bay observed that the plaintiffs did not assert

either of those two causes of action.  The court also noted,
however, that in Bahrle v. Exxon Corp., 652 A. 2d 178, 193 (N.J.
Super. Ct. App. Div. 1995), aff'd, 145 N.J. 144 (1996), the
court allowed "innocent homeowners damaged by a neighboring
landowner's discharge to recover their clean-up costs under the
Act." Emerald Bay, 2018 WL 4568358, at *4 n.8.  The Emerald Bay
court concluded, "We need not resolve in this unpublished
opinion whether Bahrle remains good law in light of Exxon
Mobil."  Id.

In contrast to how the Emerald Bay court construed Bahrle,
however, this Court does not read Bahrle to have affirmatively
permitted the homeowner plaintiffs to recover for their cleanup
costs under the Spill Act.  In Bahrle, a groundwater
contamination suit was brought by homeowners, many of whose
wells were contaminated allegedly as result of spills from
underground storage tanks at a neighboring gas station.  The
homeowners appealed the trial court's jury instruction on their
Spill Act claim.  The trial judge explained to the jury that the
Spill Act imposes strict liability on anyone who owns,
possesses, or stores petroleum products in underground
containers when gasoline escapes into the ground from the
containers, but the judge charged that liability under the Act
is not imposed for above-ground over-fill spills.  The appeals
court agreed with the plaintiffs that the charge was in error

21

because under the Spill Act, "discharge" means any act, whether or not intentional, resulting in releasing of hazardous substances into water or onto land.

The defendant, Texaco, argued that the error was harmless because strict liability under the Spill Act should not have been charged at all because the Act does not provide a private right of action.  The appeals court disagreed with Texaco: "[R]ecently, the United States District Court for New Jersey, citing the pertinent 1992 amendments to the Spill Act (L.1991, c. 372), held that the Act, as amended, 'clearly states an intent to provide a cause of action to private plaintiffs' to recover costs of clean-up." Bahrle, 652 A.2d at 193 (citing Mayor of Rockaway v. Klockner & Klockner, 811 F. Supp. 1039, 1051 (D.N.J. 1993) (finding "the Spill Act, as amended, permits a private cause of action against responsible parties to recover clean-up costs"); Analytical Measurements v. Keuffel & Esser Co., 843 F. Supp. 920, 929-30 (D.N.J. 1993) (Spill Act, as amended, affords private parties the right of contribution to recover the cost of clean-up and removal of discharge); Pitney Bowes v. Baker Indus., 277 N.J. Super. 484, 487-89, 649 A.2d 1325 (App. Div. 1994) (private right of contribution under Spill Act not subject to time-bar under N.J.S.A. 2A:14-1.1)).

Although the Bahrle court referred to these cases to refute Texaco's position that no private cause of action existed for a

22

homeowner to recover for cleanup costs, the homeowners in the case before it had not asserted a claim under the Spill Act to recover their cleanup costs. The court explained,

> In any event, the cases cited by both plaintiffs and Texaco pertain solely to the private party's right to recover the costs of clean-up and removal of the contamination, by contribution or otherwise. Here, proofs concerning plaintiffs' damages were not adduced since the case was tried on liability only. However, their complaint demands damages for emotional distress, enhanced risk of disease, loss of enjoyment of their properties and "other economic and financial harm." We do not read the Spill Act as creating a private cause of action for the recovery of such damages. Therefore, the error in the strict liability charge given under the Act was harmless.

Bahrle, 652 A.2d at 193. Thus, although Bahrle referenced one case that allowed the recovery of cleanup costs by private plaintiffs under the Spill Act directly against the alleged discharger, rather than in the form of a claim for contribution or a claim directly to the state compensation fund, Bahrle did not permit "innocent homeowners damaged by a neighboring landowner's discharge to recover their clean-up costs under the Act" as described by Emerald Bay, 2018 WL 4568358, at *4 n.8.

As with the issue regarding "written approval" by the NJDEP, the Court makes no finding whether the Spill Act permits private homeowners like Plaintiffs here to recover cleanup costs directly from the alleged dischargers, like Defendants, or whether such relief must be limited to contribution claims between dischargers, or a claim made to the NJDEP from the Spill

Compensation Fund.  Because Defendants have not moved to dismiss Plaintiffs' Spill Act count on these grounds, and the Court declines to resolve these issues *sua sponte*, the Court will not dismiss Plaintiffs' Spill Act count.  These issues will be for the parties to address, if necessary, at another time.[9]

> **(6)** ***Plaintiffs' stand-alone count for punitive damages is not proper, but their demand for punitive damages may proceed as permitted by their underlying claims***

Finally, with regard to Plaintiffs' stand-alone count for punitive damages, the Court agrees that an independent count for punitive damages is not cognizable.  Smith v. Covidien LP, 2019 WL 7374793, at *10 (D.N.J. 2019) (citing DiAntonio v. Vanguard Funding, LLC, 111 F. Supp. 3d 579, 585 (D.N.J. 2015) (citing Hassoun v. Cimmino, 126 F. Supp. 2d 353, 372 (D.N.J. 2000) ("Punitive damages are a remedy incidental to [a] cause of action, not a substantive cause of action in and of themselves.").  Plaintiffs are not prevented from seeking

---

[9] See Fed. R. Civ. P. 12(c) ("After the pleadings are closed—but early enough not to delay trial—a party may move for judgment on the pleadings."); Fed. R. Civ. P. 56(a) ("Motion for Summary Judgment or Partial Summary Judgment.  A party may move for summary judgment, identifying each claim or defense — or the part of each claim or defense — on which summary judgment is sought.  The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."); Fed. R. Civ. P. 56(b) ("Time to File a Motion.  Unless a different time is set by local rule or the court orders otherwise, a party may file a motion for summary judgment at any time until 30 days after the close of all discovery.").

punitive damages relative to their other claims, however, if punitive damages are available for such claims.  See Smith, 2019 WL 7374793 at *10 (citing Zodda v. National Union Fire Ins. Co. of Pittsburgh, Pa., 2014 WL 1577694, at *5 (D.N.J. 2014) ("It is well settled that the general rule is that there is no[ ] cause of action for 'punitive damages.'  This count will be dismissed from the complaint, but the Court notes that Plaintiff has preserved its right to argue for punitive damages as a remedy if allowed under the remaining causes of action.").  Defendants argue that any request by Plaintiffs for punitive damages must be dismissed because their alleged conduct does not warrant the imposition of punitive damages, as an award of punitive damages requires the showing that Defendants engaged in "egregious misconduct," and Plaintiffs' claims sound in basic negligence. See Quinlan v. Curtiss-Wright Corp., 8 A.3d 209, 229 (N.J. 2010) (quoting Herman v. Sunshine Chemical Specialties, Inc., 627 A.2d 1081, 1085 (N.J. 1993) ("A condition precedent to a punitive-damages award is the finding that the defendant is guilty of actual malice.  The purposes of the award [is] the deterrence of egregious misconduct and the punishment of the offender . . . ."); Jarka v. Holland, 2020 WL 6707955, at *4 (D.N.J. 2020) (explaining that under the New Jersey Punitive Damages Act, N.J.S.A. 2A:15-5.10, a plaintiff needs to show "actual malice," which is an "intentional wrongdoing in the sense of an evil-

minded act," or "wanton and willful disregard," which is "a deliberate act or omission with knowledge of a high degree of probability of harm to another and reckless indifference to the consequences of such act or omission," and noting that even gross negligence will not suffice to make punitive damages available) (citing Breeman v. Everingham (In re Paulsboro Derailment Cases), 704 F. App'x 78, 87 (3d Cir. 2017)).

The Court finds that Plaintiffs' complaint alleges conduct by Defendants that rises above gross negligence.  Plaintiffs claim that Defendants intentionally and recklessly discharged into the air and water – and in the case of 3M, manufactured and sold – cancer-causing chemicals for years, causing significant water contamination in the neighboring communities.  Whether Plaintiffs' proofs can ultimately support that contention is to be seen, but at this pleading stage, Plaintiffs' request for punitive damages, as permitted under the law governing their claims, may proceed.  See, e.g., Clyde Associates, LLC v. Mckesson Corporation & Univar Solutions USA, Inc., 2020 WL 7778067, at *4 (D.N.J. Dec. 31, 2020) (dismissing the plaintiff's claims for punitive damages under the Spill Act because it does not authorize a claim for punitive damages, but for the plaintiff's claims for punitive damages for negligence, strict liability, and trespass may proceed, as it was premature to deny them at this early stage of the case).

                    **(7)   *3M's motion to dismiss***

     As noted above, several of Plaintiffs' claims against 3M

differ from their claims against Solvay/Arkema and EID/CC

because 3M did not discharge PFAS into the environment but

rather 3M manufactured and sold NaPFO to Solvay and PFOA to

EID/CC.  For the arguments by 3M that duplicate those asserted

by the other Defendants, the Court adopts the same analysis set

forth above.  The Court will separately address 3M's arguments

regarding Plaintiffs' duty to warn and design defect claims.

     Plaintiffs allege that 3M sold products containing PFOA to

the other Defendants without disclosing the latent dangers it

knew about, including: 1) potential health hazards of PFOA, 2)

the chemical's propensity to contaminate the environment,

specifically drinking water, and 3) permitting discharge of PFAS

into the environment was likely to enter groundwater and be

ingested by residents in surrounding communities which would

result in accumulation inside the bodies of residents in

surrounding communities.  More specifically, Plaintiffs allege:

          97.  Defendant 3M knew that PFOA and PFOS were harmful
     to people and the environment based on its own studies from
     as early as the 1970s.

          98. Defendant 3M knew that PFAS could leach in
     groundwater and contaminate the environment.

          99. As early as 1960 an internal 3M memo admitted to
     understanding that its chemicals "[would] eventually reach
     the water table and pollute domestic wells."

                                27

100. 3M actively sought to suppress scientific research on the hazards associated with PFAS products and mounted a campaign to control the scientific dialogue on the exposure, analytical, fate, effects, human health, and economical risks of its PFAS products.

101. At least one scientist funded by 3M reported his goal as "keep[ing] 'bad' papers [regarding PFAS] out of the literature" because "in litigation situations" those articles "can be a large obstacle to refute."

(Docket No. 46 at 13-14.)

Plaintiffs claim that 3M had a duty to warn users of their PFAS products of the dangers of releasing PFAS into the environment, but 3M breached this duty by failing to do so. Plaintiffs also claim that 3M's PFAS products which they designed, manufactured, and sold were dangerous to an extent beyond that which would be contemplated by the ordinary consumer, and 3M knew or should have known about reasonably safer and feasible alternatives to PFAS.

3M does not argue that Plaintiffs have not pleaded the appropriate elements of these claims, but argues that Plaintiffs' complaint is short on facts to support their claims to make them plausible.  The Court disagrees.  Plaintiffs do not simply provide a legal recitation of the elements of a failure to warn claim and design defect claim, but support those elements with allegations that 3M's own studies revealed the harmful nature of the PFAS it manufactures and sells, but 3M has not warned its customers and ultimately the public at large,

including Plaintiffs, of those dangers, causing them harm.
Plaintiffs further claim that despite its awareness of the harm
PFAS products cause, 3M has not endeavored to alter its products
to be less harmful.

At this stage in the case, without the benefit of
discovery, especially where 3M is likely in possession of most
of the information relative to Plaintiffs' claims, Plaintiffs
cannot be faulted for not articulating the precise wording of a
3M warning label or describing a specific alternative design.
See, e.g., Greaves v. Ann Davis Associates Inc., 2015 WL
668227, at *5 (D.N.J. 2015) (finding that at the motion to
dismiss stage the plaintiff had alleged enough facts to engage
in discovery to try to offer evidence to support her claim,
particularly where the facts needed were not in the control of
the plaintiff) (citing Twombly, 550 U.S. at 563 n.8; Top v.
Ocean Petroleum, LLC, 2010 WL 3087385, at *4 (D.N.J. 2010)
("[F]ar from requiring that a plaintiff be in possession of the
relevant evidence in order to plead a claim, a plaintiff need
only have some good reasons - even if circumstantial and
inferential - for believing that the defendant has engaged in
some identifiable legal wrong, sufficient to convince the Court
of the claim's plausibility in light of the other possible
scenarios that are consistent with the facts alleged.")).
Plaintiffs' have asserted sufficient facts against 3M to make

their claims plausible and those claims may proceed.

### CONCLUSION

All Plaintiffs who reside within a few miles of each other have PFAS in their water wells, in the form of PFNA, PFOA or PFOA and PFOS combined.  Plaintiffs allege that Arkema and Solvay discharged PVDF, which is composed of approximately 74% PFNA, and PFOA, supplied to it by 3M, into the air and water from the West Deptford plant, which is located a few miles north of where Plaintiffs live.  Plaintiffs allege that EID/CC discharged PFOA, which it obtained from 3M, and other PFAS, including PFNA, into the air and water from the Chambers Works site located a few miles south of where Plaintiffs live.  Considering the variable nature of groundwater and air and the extensive chemicals discharged over time, this group of Plaintiffs has sufficiently pleaded its claims against all Defendants.  Their claims of water contamination allegedly caused by these Defendants survive Defendants' motions to dismiss and may proceed to discovery.

An appropriate Order will be entered.


Date: ___February 26, 2021___          ____s/ Noel L. Hillman____
At Camden, New Jersey                  NOEL L. HILLMAN, U.S.D.J.